Matter of Christie BB. v Isaiah CC. (2021 NY Slip Op 02847)





Matter of Christie BB. v Isaiah CC.


2021 NY Slip Op 02847


Decided on May 6, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:May 6, 2021

527802
[*1]In the Matter of Christie BB., Petitioner,
v
Isaiah CC., Appellant. (And Another Related Proceeding.)

Calendar Date:March 10, 2021

Before:Egan Jr., J.P., Aarons, Pritzker, Reynolds Fitzgerald and Colangelo, JJ.

Andrea J. Mooney, Ithaca, for appellant.
Jason Leifer, Ithaca, attorney for the child.



Pritzker, J.
Appeal from an order of the Family Court of Tompkins County (Cassidy, J.), entered October 19, 2018, which, among other things, partially granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to modify a prior order of custody.
Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the unmarried parents of a mixed race daughter (born in 2014). When the child was approximately three months old, the father acknowledged paternity. Pursuant to a July 2017 order, the parties stipulated that they would share joint legal and physical custody of the child, with the child alternating weeks with each parent. The mother commenced the first proceeding seeking to modify the prior order by, among other things, awarding her primary placement of the child, with alternating weekend parenting time to the father. The father answered and filed a counter petition seeking to modify the prior order by awarding him sole custody of the child. Following a fact-finding hearing,[FN1] Family Court determined, among other things, that the parties should continue to have joint legal and physical custody of the child, with parenting time on alternating weeks. However, at the suggestion of the attorney for the child, the court expanded upon the prior order by adding a provision that the mother's home shall be considered the child's primary residence for the purpose of schooling. The father appeals.
There is no dispute that a change in circumstances existed since the entry of the order in July 2017; thus, we focus our inquiry on whether Family Court's decision served the best interests of the child (see Matter of Clayton J. v Kay-Lyne K., 185 AD3d 1243, 1244 [2020]; Matter of Sherrod U. v Sheryl V., 181 AD3d 1069, 1069 [2020]). Factors to consider when conducting the best interests analysis include "the past performance and relative fitness of the parents, their willingness to foster a positive relationship between the [child] and the other parent, their fidelity to prior court orders and their ability to both provide a stable home environment and further the [child]'s overall well-being" (Matter of Jennifer VV. v Lawrence WW., 186 AD3d 946, 948 [2020] [internal quotation marks, brackets and citation omitted]; see Matter of Sandra R. v Matthew R., 189 AD3d 1995, 1997 [2020], lv dismissed and denied 36 NY3d 1077 [2021]). This Court generally accords "great deference to Family Court's factual findings and credibility determinations given its superior position to observe and assess the witnesses' testimony and demeanor firsthand, and will not disturb its custodial determination if supported by a sound and substantial basis in the record" (Matter of Daniel TT. v Diana TT., 127 AD3d 1514, 1515 [2015]; see Matter of Clayton J. v Kay-Lyne K., 185 AD3d at 1244).
At the fact-finding hearing, the mother testified that the child lives with her and the mother's two other children. The mother testified that she has lived in [*2]three or four different residences since the time the child was born. The mother also testified that she is concerned about the child's behavior, particularly kicking, spitting, hitting and swearing a lot. The mother stated that the reports from the child's Pre-K program indicate that the child is having behavioral issues that occur during both her and the father's weeks with the child. The mother testified that the father will "make a big thing out of it" every time that she tries to bring up the child's behavior with him, and that he does not communicate well. To that end, the mother testified that the communication between her and the father is poor. She also testified that, although she would like to text the father daily for updates on how the child is doing, she only texts him once or twice a week because the father texted her once saying that she did not need to text him every single day. The mother also claimed that the father attempted to change the child's school without the mother's knowledge and that the child was frequently absent from school on days she was with the father. The mother testified that, when the father picks up the child, she cries and "has a hard time departing." The mother also acknowledged that she had a rock with a confederate flag painted on it at her home. In response to questioning, the mother testified that she has never used any racial slurs in front of the child or at all. Finally, the mother acknowledged that she had not attended any parenting classes despite a provision in the prior order requiring the parents to do so.
The father's testimony also revealed that the mother and the father struggle to communicate, which has led to issues with, among other things, doctor's appointments for the child. The father testified that he went to the child's school after her first day and stated that there was confusion because, in the paperwork submitted to the school, the mother did not list any father. The father testified that the child has issues at school with kicking, swearing and spitting, but the father claims that she does not engage in any of this behavior at home. The father explained that he has talked to the teachers about the child's behavioral issues, but admitted that he has not communicated much with the mother about these issues. The father stated that, since the last order was entered, the mother has changed her residence and that the first he heard of this move was through the child. The father testified that since the child's birth, he has picked her up from seven or eight different addresses. The father explained that the child sometimes arrives with scrapes, bruises and bug bites. The father also testified that he found a bruise on the child, but he could not recall if he ever asked the mother about this mark. The father testified that he has attended several parenting classes. The father stated that the subject child missed several days of school during his time with her because [*3]she was sick. The father acknowledges that he will be moving soon and that the place he is moving to is in a different school district.
We agree with Family Court that the testimony revealed that "little has changed" since the prior order was entered. Thus, only a minor modification of the prior order was needed in the form of providing, among other things, that the mother's home shall be the child's primary residence for the purpose of where the child attends school. Although testimony revealed that the mother had relocated multiple times, the court found, and the record supports, that the mother currently has stable housing. Additionally, although the mother has moved around, testimony established that the father was planning to move as well. Furthermore, although the factor of fidelity to prior orders weighs in favor of the father, as the mother failed to attend a required parenting class, this is only one factor. Family Court clearly appreciated and addressed this concern, as evidenced by the fact that the court explicitly ordered that the mother contact the administrator of a parenting class program within one week of the issuance of the order. Moreover, although communication between the parents is not ideal, it is not so poor as to render a joint custodial arrangement unworkable. In this regard, both parties have the goal of getting back to a place where they work well together. There may come a point in the future where joint custody proves entirely unworkable, but, at this stage, we defer to Family Court's determination that the parties' relationship "is not so acrimonious as to render the award unworkable" (Matter of Patricia RR. v Daniel SS., 172 AD3d 1471, 1472 [2019]; see Elizabeth B. v Scott B., 189 AD3d 1833, 1835-1836 [2020]). It is also noted that this decision to maintain joint custody was supported by the attorney for the child (see Matter of Conway v Gartmond, 108 AD3d 667, 668 [2013]). According due deference to Family Court's credibility determinations and the evidence presented at the hearing, we find that it was in the child's best interests to continue the joint custody arrangement (see Matter of Patricia RR. v Daniel SS., 172 AD3d at 1473; Matter of Richard GG. v M. Carolyn GG., 169 AD3d 1169, 1172 [2019]).
However, we do find that the portion of Family Court's order directing that the mother's residence shall be the child's primary residence for the purpose of where the child attends school must be modified. Although the general idea of preserving the child's current school district has a sound and substantial basis in the record, as it will preserve stability for the child, basing the child's school district on where the mother resides may lead to instability in the future due to the mother's frequent moves in the past. The father does not claim that there is any problem with the current school or that the school in his school district is superior. Therefore, rather than designate the mother's residence [*4]as the primary residence for school purposes, Family Court should have ordered that the child remain in the Dryden Central School District, absent mutual agreement or further court order.
Finally, although not addressed by Family Court or the attorney for the child, the mother's testimony at the hearing, as well as an exhibit admitted into evidence, reveal that she has a small confederate flag painted on a rock near her driveway. Given that the child is of mixed race, it would seem apparent that the presence of the flag is not in the child's best interests, as the mother must encourage and teach the child to embrace her mixed race identity, rather than thrust her into a world that only makes sense through the tortured lens of cognitive dissonance. Further, and viewed pragmatically, the presence of the confederate flag is a symbol inflaming the already strained relationship between the parties. As such, while recognizing that the First Amendment protects the mother's right to display the flag (see generally People v Hollman, 68 NY2d 202, 205 [1986]), if it is not removed by June 1, 2021, its continued presence shall constitute a change in circumstances and Family Court shall factor this into any future best interests analysis.
Egan Jr., J.P., Aarons, Reynolds Fitzgerald and Colangelo, JJ., concur.
ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as directed that petitioner's residence shall be considered the child's primary residence for school purposes; the child shall attend school in the Dryden Central School District until further court order or a mutual agreement between the parties with respect thereto; and, as so modified, affirmed.



Footnotes

Footnote 1: There was no Lincoln hearing held as neither party requested one and both the attorney for the child and Family Court indicated that they felt the child was too young.